WELCH, Judge.
The appellant, Calvin McMillan, an inmate on death row at Holman Correctional Facility, appeals the circuit court's summary dismissal of his Rule 32, Ala. R. Crim. P., petition for postconviction relief attacking his capital-murder conviction and sentence of death.
In 2009, McMillan was convicted of murdering James Bryan Martin during the *1161 course of a robbery. The jury recommended, by a vote of eight to four, that McMillan be sentenced to life imprisonment without the possibility of parole. The circuit court chose not to follow the jury's recommendation and sentenced McMillan to death. This Court affirmed McMillan's conviction and sentence of death on direct appeal. See McMillan v. State, 139 So.3d 184 (Ala. Crim. App. 2010). On August 23, 2013, this Court issued its certificate of judgment.
In August 2014, McMillan filed a timely petition for postconviction relief attacking his capital-murder conviction and death sentence. He filed an amended petition in December 2014 and an amendment to one claim in his petition in February 2015. In March 2015, the circuit court issued a 72-page detailed order summarily dismissing all the claims in McMillan's amended postconviction petition. This appeal followed.
On direct appeal, this Court set out the following facts surrounding McMillan's conviction:
3245 "The State's evidence tended to show that on August 29, 2007, Calvin McMillan and Rondarrell Williams drove to the Wal-Mart discount retail store in Millbrook in a white Nissan Sentra automobile belonging to Williams's girlfriend, in order for McMillan 'to get him a ride' (R. 1046.) Williams testified that he knew that McMillan had a gun. The men parked the vehicle by a truck on the outskirts of the parking lot and Williams went into the Wal-Mart store. He purchased some speakers and returned to the vehicle, where McMillan, despite opening and closing the vehicle's front passenger door several times, had remained. After a few minutes, Williams again got out of the vehicle and returned to the store.
"While Williams was in the store, McMillan got out of the vehicle and began walking around the parking lot, eventually standing by the entrance to the store. He subsequently returned to the vehicle and sat in the front passenger seat with the door open. He then got out of the vehicle quickly, wearing a different shirt than he was wearing when he and Williams had entered the parking lot, and approached a man later identified as the victim.
"That same evening, the victim, James Bryan Martin, had driven to the Wal-Mart store in Millbrook following a Montgomery Biscuits minor-league baseball game. He had parked his Ford F-100 pickup truck in the parking lot a few rows from the vehicle driven by Williams and had entered the store. Inside, he had purchased diapers, a Vault brand beverage, and Reese's brand candy. After checking out, he put his bags in his truck.
"The victim was then approached by a man later identified as McMillan. Video surveillance of the parking lot of the Wal-Mart store, which was admitted into evidence as a DVD, shows that Martin walked several feet toward McMillan, and then turned and walked back to his truck. The surveillance video also shows that Martin got into his truck and that a few seconds later the brake lights on the truck came on. The video further shows that McMillan also walked toward Martin's truck, hesitated when another vehicle drove down the aisle, and then, when that vehicle passed, McMillan went to the driver's side door of the truck. The video demonstrates that McMillan appeared to shoot Martin and then pull him out of his truck. Martin collapsed on the concrete and McMillan shot him two more times. McMillan *1162 got into the truck and started to drive away. He then placed the truck into park, got out of the truck, and appears to have shot Martin again. At that point, McMillan quickly got back into the truck and sped out of the parking lot. Several witnesses who were present in the parking lot or who were in the entrance of the Wal-Mart store approached the victim and called for help.
"....
"Two disposable cameras were found in the truck. The film from those cameras was subsequently developed[;] one of the pictures was a photograph of McMillan pointing a pistol resembling the murder weapon at the camera, a photograph of a 9mm High Point pistol positioned on a pile of money, another photograph of the pistol placed on a pillow or bedding, and two photographs of McMillan making hand gestures at the camera. There was also a photograph of a closet containing a striped shirt and a camouflage hat that matched the description of the shirt and hat worn by the man who had shot Martin. Among the clothing found in the truck was a black shirt with a neon skull that resembled the shirt worn by the man in Williams's girlfriend's vehicle the first time he had gotten out of the vehicle. The officers also found a pair of black Dickie brand shorts like those worn by the man who shot Martin; in the pocket of those shorts was a 9mm shell casing and a Reese's brand candy wrapper.
"McMillan gave a statement indicating that he had been given a ride to Montgomery in the truck belonging to Martin by a man named Melvin Ingram Browning and that Browning had driven away with McMillan's possessions in the truck. The State introduced evidence at trial indicating that McMillan had a Social Security card for a Melvin Eugene Browning in his wallet. (R. 1240.) Melvin Eugene Browning testified that his wallet had been lost years before this incident and that he was in the Lee County jail at the time of the offense. The State presented evidence to substantiate Browning's whereabouts at the time of the offense."
McMillan, 139 So.3d at 191-93 (footnotes omitted).
Standard of Review
McMillan appeals the circuit court's ruling dismissing a Rule 32, Ala. R. Crim. P., petition. "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3, Ala. R. Crim. P.
"If the circuit court is correct for any reason, even though it may not be the stated reason, we will not reverse its denial of the petition." Reed v. State, 748 So.2d 231, 233 (Ala. Crim. App. 1999). The plain-error standard of review does not apply when this Court evaluates the denial of a collateral petition attacking a death sentence. See Ex parte Dobyne, 805 So.2d 763 (Ala. 2001), and Rule 45A, Ala. R. App. P. Moreover, the procedural bars in Rule 32, Ala. R. Crim. P., apply to all cases, even those involving the death penalty. Hooks v. State, 822 So.2d 476 (Ala. Crim. App. 2000).
Here, the circuit court summarily dismissed McMillan's petition based on the pleadings. In discussing the pleading requirements related to postconviction petitions, this Court has stated:
"Although postconviction proceedings are civil in nature, they are governed by the Alabama Rules of Criminal Procedure. See Rule 32.4, Ala. R. Crim. P. The 'notice pleading' requirements relative to civil cases do not apply to Rule 32 proceedings. 'Unlike the general requirements related to civil cases, the *1163 pleading requirements for postconviction petitions are more stringent....' Daniel v. State, 86 So.3d 405, 410-11 (Ala. Crim. App. 2011). Rule 32.6(b), Ala. R. Crim. P., requires that full facts be pleaded in the petition if the petition is to survive summary dismissal See Daniel, supra. Thus, to satisfy the requirements for pleading as they relate to postconviction petitions, Washington was required to plead full facts to support each individual claim."
Washington v. State, 95 So.3d 26, 59 (Ala. Crim. App. 2012).
"The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy one. Conclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b). The full factual basis for the claim must be included in the petition itself. If, assuming every factual allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b). See Bracknell v. State, 883 So.2d 724 (Ala. Crim. App. 2003)."
Hyde v. State, 950 So.2d 344, 356 (Ala. Crim. App. 2006).
"An evidentiary hearing on a coram nobis petition [now Rule 32 petition] is required only if the petition is 'meritorious on its face.' Ex parte Boatwright, 471 So.2d 1257 (Ala. 1985). A petition is 'meritorious on its face' only if it contains a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the facts relied upon (as opposed to a general statement concerning the nature and effect of those facts) sufficient to show that the petitioner is entitled to relief if those facts are true. Ex parte Boatwright, supra ; Ex parte Clisby, 501 So.2d 483 (Ala. 1986)."
Moore v. State, 502 So.2d 819, 820 (Ala. 1986).
"[A] circuit court may, in some circumstances, summarily dismiss a postconviction petition based on the merits of the claims raised therein. Rule 32.7(d), Ala. R.Crim. P., provides:
" 'If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition. Leave to amend shall be freely granted. Otherwise, the court shall direct that the proceedings continue and set a date for hearing.'
" ' "Where a simple reading of the petition for post-conviction relief shows that, assuming every allegation of the petition to be true, it is obviously without merit or is precluded, the circuit court [may] summarily dismiss that petition." ' Bishop v. State, 608 So.2d 345, 347-48 (Ala. 1992) (emphasis added) (quoting Bishop v. State, 592 So.2d 664, 667 (Ala. Crim. App. 1991) (Bowen, J., dissenting)). See also Hodges v. State, 147 So.3d 916, 946 (Ala. Crim. App. 2007) (a postconviction claim is 'due to be summarily dismissed [when] it is meritless on its face')."
Bryant v. State, 181 So.3d 1087, 1102 (Ala. Crim. App. 2011). "The sufficiency of pleadings in a Rule 32 petition is a question of law. 'The standard of review for pure questions of law in criminal cases is de novo. Ex parte Key, 890 So.2d 1056, 1059 (Ala. 2003).' " Ex parte Beckworth, 190 So.3d 571, 573 (Ala. 2013).
With these principles in mind, we review the claims raised by McMillan in his brief to this Court.
*1164 I.
McMillan first argues that the circuit court erred in summarily dismissing his Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), claims. Specifically, he argues that the State failed to disclose that the inmate McMillan stabbed while McMillan was incarcerated, Winston Lucas, Jr., had assaulted McMillan before the stabbing. This error was compounded, he argues, by the State knowingly presenting Lucas's allegedly false testimony.
McMillan pleaded the following in his amended postconviction petition:
"[Winston] Lucas and the other inmates attacked McMillan at the direction of Elmore County jail officers. This was a routine practice in 8-pod, the section of the jail in which Lucas was housed. Officers arranged for Lucas and other inmates to beat up certain inmates in exchange for items such as food from McDonald's [fast-food restaurant] or tobacco. This was why Lucas and other inmates attacked McMillan.
"At the time of McMillan's judicial sentencing proceeding, the State knew that Lucas and other inmates had attacked and physically injured McMillan prior to the incident on March 1, 2008. The State knew this information in at least three independent ways. First, the incident occurred at the Elmore County jail, a government agency operated by government agents.... A jail record notes that McMillan, from 8-pod, received treatment for a headache and swollen right eye on February 16, 2008; the nurse noted that it '[a]ppears that someone hit him.' However, the jail records which were produced to McMillan by the Elmore County jail contain no incident report describing the attack on McMillan. Second, jail officers had directed Lucas and the others to attack McMillan.... Third, prior to McMillan's judicial sentencing proceeding, Lucas told prosecutor James Houts during an interview at the Staton Correctional Facility that he and other inmates had attacked McMillan prior to the incident that occurred on March 1, 2008. Houts told Lucas that he did not have to mention that in court. As stated above, Lucas later testified that he and McMillan had never been involved in a physical altercation before March 1, 2008."
(C. 526-27.)
The State argued in its motion to dismiss the postconviction petition that this claim was procedurally barred because it could have been raised at trial or on direct appeal, but was not. (C. 1064.) McMillan moved to amend this claim (C. 1243.), and the circuit court granted that motion. (C. 1248.) However, McMillan failed to plead in his amendment to this claim why the claim could not have been raised at trial or on direct appeal. (C. 1249-53.)
The record of McMillan's judicial sentencing hearing shows that Lucas testified that he had been incarcerated with McMillan at the Elmore County jail and that in March 2008, McMillan attacked him with a "shank." On cross-examination Lucas was questioned as to whether he and other inmates had attacked McMillan before McMillan attacked Lucas. The following occurred:
"[Defense counsel]: Okay. Back to this particular incident. You're saying that [McMillan] just walked up out of the blue and for absolutely no reason attacked you; is that what you're saying?
"[Lucas]: We had a little argument.
"[Defense counsel]: You had a little argument before this, correct?
"[Lucas]: Yeah.
*1165 "[Defense counsel]: Okay. That's in about December of last year, is that when the argument was?
"[Lucas]: I guess, I don't know. I guess.
"[Defense counsel]: Okay. Shortly before this incident occurred at the jail, correct?
"[Lucas]: Yes, sir.
"[Defense counsel]: All right. And in that little argument isn't it true that you and about four other inmates jumped on [McMillan] and attacked him?
"[Lucas]: No, sir.
"[Defense counsel]: Okay. There was some type of physical altercation between you and [McMillan] and some other folks before this alleged stabbing, correct.
"[Lucas]: No. It was just me and him talking. I can't speak on behalf of others, you know what I'm saying, because it was just me and him had a little argument ourselves about respect.
"[Defense counsel]: Okay. About him not respecting you?
"[Lucas]: General respect to the cell.
"[Defense counsel]: To the cell. Okay. And that got a little physical, correct?
"[Lucas]: No, we never did have any type of physical contact at that time. It was just talk and it never escalated to that point."
(Trial Record, R. 1957-58.)
The circuit court made the following findings when dismissing this claim:
"This claim, however, could have been raised during post-trial motions or on direct appeal. Accordingly, it is procedurally barred. Ala. R. Crim. P., Rule 32.2(a)(3) and (5).
"Alternatively, this claim is dismissed for failure to allege a material issue of law or fact. The amended petition claims that Winston Lucas, a witness for the State at the judicial sentencing hearing, lied about having physically assaulted McMillan in the months prior to McMillan stabbing Lucas in the eye and hand while he was incarcerated and awaiting trial. McMillan alleges that he was kicked and punched by Winston Lucas, Herbert Buchanon, and two other inmates many weeks prior to McMillan's attack on Lucas with a deadly weapon. McMillan further alleges that Lucas was the 'ringleader' of the attack and that it had been arranged by jailers as part of a 'routine practice.' McMillan alleges 'suppression' of the evidence because the alleged assault against him (by Lucas) was done at the behest of jailers and the sheriff and because Lucas allegedly told a prosecutor of this fact during a pre-trial interview.
"McMillan cannot establish 'suppression' of this evidence as a matter of law. By his own admission, McMillan would have been present at the time of the alleged assault by Lucas, Buchanon and the other inmates. Also, McMillan's amended petition further admits that there are no incident reports describing such an attack on McMillan, so there is no allegation that such documents were suppressed.
"As noted by the State in its motion to dismiss, 'suppression' is a necessary element of a Brady claim. Because McMillan would have been present at the scene he alleges in his amended petition, he cannot prevail on this aspect of his claim.... Here, McMillan was certainly aware of these alleged facts and could have testified to these facts is he had so desired.
"The State is also correct that the facts McMillan claims were suppressed are not material for purposes of Brady [v. Maryland, 373 U.S. 83 (1963) ]. That is, there is no reasonable probability of a different result had evidence that Lucas assaulted McMillan weeks or months prior to *1166 McMillan's stabbing Lucas in the hand and eye been presented to the Court. See Kyles v. Whitley, 514 U.S. 419 (1995).
"....
"This claim would be dismissed due to a lack of specificity. As McMillan's amended petition notes, Lucas denied (under oath) having any physical altercation with McMillan prior to McMillan's stabbing Lucas with a shank. The amended petition further admits that there is no incident report describing an attack on McMillan by Lucas. The State, represented by the attorney who is alleged to have had knowledge of Lucas's false testimony, has filed an answer denying this claim, with the ethical and professional implications that go along with such an action. Yet, the petition is silent as to any evidence that McMillan was assaulted by Lucas prior to McMillan's shanking of Lucas. McMillan could have offered testimony in support of such a claim at the sentencing hearing, but did not do so. McMillan, then, has failed to carry his burden of pleading facts (as opposed to conclusory statements), which, if proven, would establish he is entitled to relief in light of the record of trial. Ala. R. Crim. P., Rule 32.3. See also Ala. R. Crim. P., Rule 32.6(b)."
(C. 1497-1501.)
To adequately plead a Brady claim in a postconviction petition
"[A] petition must allege facts that, if true, would establish that the prosecution suppressed evidence that was favorable to the defendant and material. Cf. Rule 32.6(b), Ala. R. Crim. P.; Williams [v. State ], 710 So.2d [1276] at 1296-97 [ (Ala. Crim. App. 1996) ]. Additionally, 'a Rule 32 petitioner has no burden to plead facts in his or her petition negating the preclusions in Rules 32.2(a)(3) and (a)(5) in order to sufficiently plead a [ Brady v. Maryland, 373 U.S. 83 (1963) ] claim....' Mashburn v. State, 148 So.3d 1094, 1119 n. 5 (Ala. Crim. App. 2013) (citing Ex parte Beckworth, 190 So.3d 571, 574 (Ala. 2013) ). Rather, the State has the burden to plead any ground of preclusion it believes applies to bar review of a Brady claim. Ex parte Beckworth, [190 So.3d 571, 574 (Ala. 2013) ]. However, once the State has pleaded a ground of preclusion, that ground is presumed to apply until the petitioner meets his 'burden of disproving its existence by a preponderance of the evidence.' Rule 32.3, Ala. R. Crim. P."
Reynolds v. State, 236 So.3d 189, 200 (Ala. Crim. App. 2015).
Here, McMillan failed to plead in the amendment to his petition why this claim was not procedurally barred in this postconviction proceeding. Indeed, Lucas's cross-examination reflects that defense counsel questioned Lucas about whether he had attacked McMillan before McMillan attacked him. Accordingly, the circuit court correctly found that this claim was barred pursuant to Rules 32.2(a)(3) and (5), Ala. R. Crim. P.
Alternatively, the circuit court found that this claim lacked merit.
" 'There is no Brady [v. Maryland, 373 U.S. 83 (1963),] violation where the information in question could have been obtained by the defense through its own efforts.' Johnson [v. State], 612 So.2d [1288] at 1294 [ (Ala. Crim. App. 1992) ] ; see also Jackson v. State, 674 So.2d 1318 (Ala. Cr. App. 1993), aff'd in part and rev'd in part on other grounds, 674 So.2d 1365 (Ala. 1995). ' "Evidence is not 'suppressed' if the defendant either knew ... or should have known ... of the *1167 essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982) [, cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983) ].' Carr v. State, 505 So.2d 1294, 1297 (Ala. Cr. App. 1987) (noting, 'The statement the appellant contends was suppressed in this case was his own, and no reason was set forth to explain why he should not have been aware of it.'). Where there is no suppression of evidence, there is no Brady violation. Carr, 505 So.2d at 1297.''
Freeman v. State, 722 So.2d 806, 810-11 (Ala. Crim. App. 1998).
Also,
"[t]o prove a Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), violation [or a Napue v. Illinois, 360 U.S. 264 (1959), violation], the petitioner must show that: (1) the State used the testimony; (2) the testimony was false; (3) the State knew the testimony was false; and (4) the testimony was material to the guilt or innocence of the accused. Williams v. Griswald, 743 F.2d [1533] at 1542 [ (11th Cir. 1984) ]. '[T]he defendant must show that the statement in question was "indisputably false," rather than merely misleading.' Byrd v. Collins, 209 F.3d 486, 517 (6th Cir. 2000) (quoting United States v. Lochmondy, 890 F.2d 817, 823 (6th Cir. 1989) ). 'The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.' Lochmondy, 890 F.2d at 822. '[I]t is not enough that the testimony is challenged by another witness or is inconsistent with prior statements, and not every contradiction in fact or argument is material.' United States v. Payne, 940 F.2d 286, 291 (8th Cir. 1991) (citing United States v. Bigeleisen, 625 F.2d 203, 208 (8th Cir. 1980) ). '[T]he fact that a witness contradicts himself or herself or changes his or her story does not establish perjury.' Malcum v. Burt, 276 F.Supp.2d 664, 684 (E.D. Mich. 2003) (citing Monroe v. Smith, 197 F.Supp.2d 753, 762 (E.D. Mich. 2001) )."
Perkins v. State, 144 So.3d 457, 469-70 (Ala. Crim. App. 2012).
We agree with the circuit court that McMillan would have personal knowledge of the information he alleges was suppressed; therefore, there was no suppression of evidence. See Freeman, supra. Also, McMillan candidly admits that there was no incident report of the alleged attack. McMillan failed to plead that the State suppressed any evidence, much less material evidence, or that the State knowingly used false testimony. Thus, this claim was correctly summarily dismissed pursuant to Rule 32.7(d), Ala. R. Crim. P., because no material issue of fact or law exists that would entitle McMillan to relief.
II.
McMillan next argues that the circuit court erred in summarily dismissing his claim that his trial counsel was ineffective for failing to present certain evidence in mitigation during the penalty phase of his capital-murder trial.
To prevail on a claim of ineffective assistance of counsel, the petitioner must satisfy the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show: (1) that counsel's performance was deficient; and (2) that the petitioner was prejudiced by the deficient performance.
"To sufficiently plead an allegation of ineffective assistance of counsel, a Rule 32 petitioner not only must 'identify the *1168 [specific] acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but also must plead specific facts indicating that he or she was prejudiced by the acts or omissions, i.e., facts indicating 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. A bare allegation that prejudice occurred without specific facts indicating how the petitioner was prejudiced is not sufficient."
Hyde v. State, 950 So.2d 344, 356 (Ala. Crim. App. 2006).
" 'A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.' Nelson v. Hargett, 989 F.2d 847, 850 (5th Cir. 1993) (quoting United States v. Green, 882 F.2d 999, 1003 (5th Cir. 1989) ). '[C]laims of failure to investigate must show with specificity what information would have been obtained with investigation, and whether, assuming the evidence is admissible, its admission would have produced a different result.' Thomas v. State, 766 So.2d 860, 892 (Ala. Crim. App. 1998) (citing Nelson, supra), aff'd, 766 So.2d 975 (Ala. 2000), overruled on other grounds by Ex parte Taylor, 10 So.3d 1075 (Ala. 2005)."
Mashburn v. State, 148 So.3d 1094, 1133 (Ala. Crim. App. 2013).
Initially,
"The inquiry of whether trial counsel failed to investigate and present mitigating evidence turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented."
Commonwealth v. Simpson, 620 Pa. 60, 100, 66 A.3d 253, 277 (2013).
Here, trial counsel presented a plethora of evidence in mitigation. In fact, the evidence convinced the jury, by a vote of 8 to 4, to recommend a sentence of life imprisonment without the possibility of parole. "[T]he jury's recommendation of life imprisonment without parole negates [the appellant's] showing that he was prejudiced by counsel's performance." Boyd v. State, 746 So.2d 364, 389 (Ala. Crim. App. 1999).
McMillan was represented at trial by attorneys W. Kendrick James and Bill W. Lewis. Counsel presented the following evidence in mitigation at McMillan's sentencing hearing:[1]
Ella Torrence, McMillan's older sister, testified that their father was a drug dealer and that their mother was a prostitute. She said that while she was living in New York her father was "locked up" in 1987, and her aunt, Carol Weaver, came to New York and took her and her sibling to live with her in Shorter, Alabama. Torrence said that, when her mother eventually came to Alabama her mother was pregnant with McMillan who was born in 1988. Torrence said that, during her mother's pregnancy, she continued to use drugs, she continued to smoke marijuana, she continued to drink alcohol, and she continued to smoke cocaine. Torrence said that McMillan was placed in foster care shortly after his birth. In 1991, Torrence said, she and McMillan moved in with their mother in Waugh, Alabama, and at that time their mother's boyfriend, Willie Ford, was living *1169 with them. Torrence said that Ford was a "street hustler" and that Ford was violent and had a bad temper. They lived in a trailer, she said, that had no electricity and no water, and there was never any food. Ford frequently was abusive, Torrence said, and had even pulled a gun on them. He frequently beat their mother in front of them. Torrence said that Ford's son sexually abused McMillan. She said that she and her siblings often stayed with their mother in shelters for battered women. When Torrence got to high school, she said, she started talking to counselors, and the Department of Human Resources ("DHR") got involved. In 1998 Ford and her mother were arrested and charged with child endangerment after Ford beat McMillan with a pool stick and put McMillan in the hospital. McMillan, she said, was placed in different foster-care homes after his mother was arrested in 1998.
Carol Weaver, McMillan's maternal aunt, testified that in 1987 she went to New York to pick up her sister's children and bring them to live with her in Shorter, Alabama. She said that sometime later that year when McMillan's mother, Kimberly McMillan, came to Alabama Kimberly was pregnant with McMillan. McMillan was placed in foster care not long after his birth, Weaver said. At that time, she said, Kimberly was living with Willie Ford, who was a drug dealer. Weaver testified that in 1998 Kimberly and Ford were arrested, that Kimberly was charged with child endangerment and that Ford was charged with assaulting McMillan. Weaver said that in 1996, when McMillan was approximately 10 years old, she first learned that McMillan had been molested. McMillan, Weaver said, was aggressive and angry and she had to place him in foster care because she could not handle his behavior.
Teal Dick, director of the Alabama Family Resource Center in Chilton County, testified that he was retained by defense counsel to review all DHR records related to McMillan, that he reviewed "a pile of them," and that he spoke to former social workers and a psychologist about McMillan. Dick said that Ford had a history of violent behavior, that in 1995 there were allegations of child abuse, and that McMillan and his siblings had been beaten with extension cords and punched in their stomachs. During Dick's testimony various DHR reports that detailed abuse and neglect by McMillan's mother and her boyfriend were admitted into evidence. DHR records, Dick said, showed that Kimberly McMillan and her children were in protective shelters for 16 days in 1995 and 92 days in 1997. Dick read the following from one report:
"When we arrived at the home both Kimberly and Willie were there. One of the officers kept Willie Ford outside while Kimberly showed us the trailer they lived in. It was dark and Kimberly explained that they had blown a fuse last night. They had electricity, but no water, no phone, and only a small space heater to keep them warm. There was a stove that didn't work and she explained that they cooked on a small grill that was on the porch. The refrigerator was empty and the only visible sign of food was a loaf of bread. There was no kitchen sink and the only water is what they got from the gas station. To take a bath, Kimberly explained that they have to rent a hotel room. The room where Ella and her brother sleep had a couple of old mattresses on the floor with a sheet and a blanket thrown loosely over the mattresses. There didn't appear to be clothes and other necessities in the home. The officer took pictures of the trailer. Mr. Ford had a rifle that was under the pool table.
"We were all in agreement that the children were being neglected and both Kimberly McMillan and Willie Ford *1170 were arrested. Mr. Ford was visibly irritated by the arrest. I talked privately with Ms. McMillan and explained when she got out of jail I would be glad to help her get shelter if she was willing to get the help she needs for her drinking problem. I talked with her about Willie's anger and the danger this might put her in if she goes back to the trailer after getting out of jail."
(Trial Record, p. 1597-98.) Dick further detailed the numerous times the children were given emergency vouchers for food while they were in foster care, that McMillan had had five different social workers in a five-or seven-year period, and that in that same period he had been placed in 25 or 26 different homes.
Emma Stacy Cosby, the clinical director for SafetyNet Youth Systems, testified that SafetyNet is a residential psychiatric-treatment facility for individuals under the age of 21 and that it recruits, trains, and licenses foster homes. She said that McMillan was one of the children under her care in 2001 when he was placed in a foster home. Cosby testified concerning an incident that occurred in 2001 when she was in the neighborhood and McMillan threatened her and his foster mother and McMillan was arrested. Cosby further testified that McMillan had been treated by Dr. Daniel Mejer in 2001. Dr. Mejer felt strongly that McMillan needed residential treatment and that if he did not get help he would end up in prison. (R. 1660.) She detailed one foster home in which McMillan had been placed where he had been physically abused. (R. 1665.)
Eddie Tucker, McMillan's father, testified that he came into contact with Kimberly McMillan in 1987 when he was driving a tractor-trailer cross country and was in New York. He told her that he was driving to Montgomery and she asked for a ride to Montgomery. They got married and Kimberly had McMillan soon after the marriage. He said that child support had been taken out of his check and sent to McMillan's aunt, with whom he lived for a while. Tucker said that DHR never contacted him about McMillan and that he would have taken McMillan into his home had he known what had been happening to him.
Dr. Kimberly Ackerson, a forensic psychologist, testified that she examined McMillan and spoke with several of his family members and reviewed various records relating to McMillan. It was her opinion that McMillan had a conduct disorder which, she said, is an "onset psychiatric disorder and it's manifested by behavioral problems." (R. 1701.) She also testified that McMillan has an "oppositional defiance disorder." (Trial Record, R. 1702.) Specifically, she said, McMillan was defiant and resisted and rejected authority. McMillan's counselor recommended that he get residential treatment. She testified:
"One of the things that the records show is that [McMillan] demonstrated academic problems early on. And over the course of time he has been subjected to psychological testing primarily looking at intellectual testing and achievement testing. And one of the things that the achievement testing has consistently shown is that [McMillan] had functioned well below his same age peers in the areas of reading, math, English.
"And so what you do have is you have a young man who in my opinion has been affected by numerous factors starting from when he was in utero. We have a mother that was using drugs and alcohol. He is then born to a mother who cannot, because of her own personal issues, provide the trust, the relationship and the attachment that this child needs.
"The next step down we now have a child who is subjected to abuse. And not just slapped around, he is having guns *1171 pointed at him, he is being sodomized. He continues to learn and understand that the world is a hostile negative place.
"What happens at this juncture when he's about six, seven, eight years of age, especially after I believe when he was sodomized, is he develops a way of coping with this world. And his way of coping with this world is to remain in what is commonly referred to as a fight or flight response. In other words, he is prepared to either fight or flight from the situation. He doesn't know how else to react. He hasn't been given the tools, he hasn't been given the environment to learn how to react in a normal environment.
"So this coping mechanism, which is an adaptive coping mechanism for him in the home, is obviously a maladaptive coping mechanism for him within the foster home and within the different facilities that he goes to. So it is not surprising to me that a young individual who already has a learning problem, so he has difficulty learning as it is, what he has learned is a very maladaptive way of coping, is put-simply put into a residential or is put into a foster home and is expected to behave. That really was not an appropriate or fair expectation of this young man. And, in my opinion, given that he was tossed to all of these different homes, a couple of facilities here and there, what happened was there was a failure to really look and see what was driving these behaviors. Why was he continuing to act in such a maladaptive way?
"And one of the reasons that I think he continued to act in this manner is that he does have symptoms of posttraumatic stress disorder. And one of the symptoms of posttraumatic stress disorder in particular is hyperarousal and hypervigilance. And that goes back to that fight or flight response. He has to be hypervigilant, he has to be aroused, he has to be on his guard all the time because he never knows what's going to happen.
"Over time as a result of being in that mode, there can be neurological changes. And what happens is the brain basically, for lack of a-you know, for ease of understanding, it's that the brain is always prepared to be that way, always prepared to be hyperaroused, always prepared to be on guard. And when you simply put them into a healthy environment, hopefully a safe home, it doesn't just turn off. The brain continues to function that way. He doesn't know how to engage appropriately. He doesn't understand that people are really trying to reach out and help him, because he's never experienced that before. And instead he is constantly put from one place to another because of his behavior problems and the true crux of the issue was never addressed.
"And I think from years of this, this is why, just over the years of all of this, we continue to have behavior problems, which he meets the antisocial personality disorder. He's got symptoms of an anxiety disorder which I mentioned is posttrauma stress disorder. He certainly has learning disabilities. And all of this really prepared him to not be able to function in the average everyday community. And, in fact, Calvin, during our interview, I don't know if you knew this, but he made a very insightful comment. And what he stated to me was 'all of these years prepared me to be here in jail.' And that really is what I find through the records, that he really never had an opportunity to learn how to behave and function in society as you and I know it. Rather he knows how to function in a society where there's control, where there are people that tell you what to do and how to do it."
*1172 (Trial Record, R. 1706-09.) Dr. Ackerson testified that Dr. Kirkland had diagnosed McMillan with borderline intellectual functioning, which, she said, is "just above mental retardation or mild mental retardation." (Trial Record, R. 1722.)
After Dr. Ackerson testified, defense counsel asked for it to be a part of the record that McMillan's mother was present and ready to testify but that it was agreed by counsel and McMillan's mother that it would be best if she did not testify. She was questioned on the record about this decision and indicated that it was her decision not to testify at McMillan's trial. (Trial Record, R. 1728.)
At sentencing, the jury recommended a sentence of life imprisonment without the possibility of parole. The circuit court found two statutory mitigating circumstances: the fact that McMillan had no significant history of prior criminal activity and McMillan's young age at the time of the murder. As nonstatutory mitigating circumstances the circuit court found that
"[McMillan] was raised in extreme poverty; that he was abandoned by his mother; that he was physically abused as a child; that he was raped as a child, that he was a witness to his mother's and sister's abuse; that he was raised in the home of an alcoholic/drug addict; that he did not get the treatment he needed; that he had no positive male role models; that he suffered from psychological and emotional difficulties; and that his intellectual functioning was in the borderline range."
(Trial Record, C. 20.)
The United States Supreme Court in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), stated, when reviewing the sufficiency of a claim that counsel was ineffective for failing to present mitigating evidence:
"In Strickland [v. Washington, 466 U.S. 668 (1984) ], we made clear that, to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id., at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."
539 U.S. at 534.
" ' "[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir. 2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir. 2006) ).' Eley v. Bagley, 604 F.3d 958, 968 (6th Cir. 2010). 'This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.' United States v. Harris, 408 F.3d 186, 191 (5th Cir. 2005)."
Daniel v. State, 86 So.3d 405, 429-30 (Ala. Crim. App. 2011).
We now consider the claims raised by McMillan in his brief to this Court.
A.
McMillan first argues that his trial counsel was ineffective for failing to investigate and to present evidence regarding his intellectual deficits or his low IQ. Specifically, McMillan pleaded that his trial counsel should have investigated and presented evidence indicating that his school records revealed that he had learning problems at a young age, that testing revealed serious intellectual and adaptive deficits, that his family members noticed his mental deficits, that McMillan's mother is intellectually disabled, and that McMillan's *1173 stepfather is also intellectually disabled.
The circuit court made the following findings on this claim:
"In preparing for trial, McMillan and his defense had the services of Dr. Kimberly Ackerson, a board certified forensic examiner in psychology with a great deal of experience testifying as an expert in numerous courts. As part of her expertise, Dr. Ackerson had extensive experience with the Alabama Department of Mental Health and Mental Retardation. Prior to McMillan's trial, Dr. Ackerson had served on the Blue Ribbon Committee on Mental Health Testimony in Alabama Capital Cases. In this case, Dr. Ackerson met with McMillan, his family members and reviewed the records obtained by defense counsel and did not express any opinion that McMillan suffered from mental retardation. Dr. Ackerson's invoice, contained in the fee declaration of [Kendrick] James [one of McMillan's trial counsel,] which is contained in the Court's files and of which the Court takes judicial notice, reflects that she spent three (3) hours conducting psychological and forensic assessments in this case. As noted above, Dr. Ackerson did not take issue with Dr. Kirkland's opinion that McMillan was functioning one level above mild mental retardation.
"Recently, the Supreme Court noted, 'The selection of an expert witness is a paradigmatic example of the type of "strategic choice" that, when made "after thorough investigation of the law and facts," is "virtually unchallengeable." ' Hinton v. Alabama, [ 571 U.S. 263,] 134 S.Ct. 1081, 1089 (2014) (quoting Strickland [v. Washington ], 466 U.S. [668] at 690 [ (1984) ] ). In this case, the defense's use of highly qualified, board-certified forensic psychological who interviewed McMillan, spoke to his family, reviewed the records collected about McMillan's life and who did not dispute Dr. Kirkland's assessment regarding McMillan's classification of borderline intellectual functioning insulates them from the second-guessing contained in the petition. Counsel for McMillan could have reasonably relied on Dr. Ackerson's assessment of McMillan and her acceptance of Dr. Kirkland's findings in choosing not to pursue a mental retardation sentencing defense.
"....
"[McMillan's] videotaped interview with Millbrook police officers would also provide a reasonable basis for a competent lawyer to determine that efforts to prove deficits in adaptive functioning, in the face of an expert's standardized instrument saying that such deficits do not exist, would be a fruitless endeavor.... In the light of McMillan's demeanor in his statement to police, including his goal-directed activity of attempting to deceive police and shift blame to a third party based on an actual person, and the existence of standardized testing suggesting that [McMillan's] adaptive functioning was not impaired, trial counsel could have reasonably determined that the strategy now advocated in the post-conviction petition would be a waste of defense resources.
"....
"By the penalty phase of trial, the jury had seen McMillan, his demeanor, and his ability to interact and communicate with police during his videotaped interview. The jury knew that McMillan was living on his own and had previously worked at Hyundai, based on McMillan's employee identification card being admitted into evidence. The jury further saw McMillan undertake goal-directed activity in that he decided he wanted a truck, got transportation to a busy shopping *1174 area to find someone's truck he could steal, he laid in wait for the right victim, and he fled from the police (twice). McMillan was the primary instigator of the crime and the crime was not the result of McMillan being a 'follower.' The jury also knew about the presence of all of McMillan's worldly possessions in the victim's truck, meaning they knew McMillan was able to take possession of, and keep up with, tangible goods without assistance from others. This evidence also showed McMillan was able to understand the need to engage in flight from the area following his commission of the offense of murder. Other goal-directed activity evidence included McMillan's attempts to alter legal and financial documents pertaining to the truck in order to make it appear he had a possessory interest in the truck. At a minimum, that activity reflected McMillan's knowledge about the concepts of ownership and documentary evidence of ownership, financial matters and title documents. In addition, McMillan was astute enough to attempt to misdirect police toward a third-party suspect named Melvin Browning. Against this backdrop, defense counsel could have reasonably decided that arguing their client was mentally retarded was a lost cause, especially in the light of the findings of Dr. Kirkland and no findings by Dr. Ackerson to the contrary....
"Trial counsel obtained the valuable services of multiple experts and the record establishes that they conducted a thorough investigation, with the records they uncovered used by McMillan's postconviction counsel at present. It cannot be said that the facts alleged in the amended petition, if true, would establish deficient performance on the part of trial counsel. Quite simply, they did enough to investigate and uncover issues pertaining to McMillan's mental health and mental status to present a reasonable and effective mitigation strategy. There are no 'red flags' alleged in the amended petition or contained in the record that would have required defense counsel to pursue mental retardation as a defense to the imposition of capital punishment in this case."
(C. 1445-52.)
When addressing a counsel's duty to investigate, this Court has stated:
" '[T]his duty only requires a reasonable investigation.' Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir. [ (Ala.) ] 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066 ; Morrison v. State, 551 So.2d 435 (Ala. Cr. App. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel's obligation is to conduct a 'substantial investigation into each of the plausible lines of defense.' Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). 'A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.' Id., 466 U.S. at 686, 104 S.Ct. at 2063."
James v. State, 61 So.3d 357, 363-64 (Ala. Crim. App. 2010).
The record of McMillan's trial shows that his counsel moved for funds to hire a mitigation expert. That motion was granted in an amount not to exceed $20,000. (Trial Record, C. 130.) Counsel also moved that McMillan be mentally evaluated to determine his IQ and his mental condition at the time of the offense. (Trial Record, C. 135-36.) That motion was also granted. (Trial Record, C. 141.) McMillan was examined by Dr. Karl Kirkland, a state psychologist. Defense counsel also retained the services of Dr. Kimberly Ackerson, a forensic psychologist. Counsel also moved *1175 for discovery of all institutional records related to McMillan's life, including all school records
"[g]enerated or maintained by Dannelly Elementary, Opelika Elementary, Tuskegee Public School, Lee High School, Sydney Lanier High School, Lee County Board of Education, Macon County Board of Education, Montgomery County Board of Education or any other educational facility or entity in Alabama."
(Trial Record, C. 137-39.) The circuit court granted that motion. (Trial record, C. 146-47.)
The report complied by Dr. Kirkland is contained in the trial record. (Trial Record, C. 1006-15.) In that report Dr. Kirkland states that he spoke to some of McMillan's family members. He said that Carol Weaver, McMillan's aunt, told him that McMillan had "lifelong learning problems but [she] would have never characterized him as being mentally retarded." (Trial Record, C. 1008.) Dr. Kirkland found that McMillan had an IQ of 76, and it was his opinion that "[McMillan] is not mildly retarded, but functions in the classification range immediately above the classification of mild mental retardation as well as in the range of low average intellectual functioning." (Trial Record, C. 1014.) Also, it is clear from the record that McMillan's mother was present at the sentencing hearing but chose not to testify based on her discussion with McMillan's counsel.
"This case does not present the situation where counsel completely failed to investigate mental health mitigation." Carter v. State, 175 So.3d 761, 772 (Fla. 2015). "Counsel cannot be found deficient for relying on the evaluations of qualified mental health experts, 'even if ... those evaluations may not have been as complete as others may desire.' " 175 So.3d at 775.
" '[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'
" 466 U.S. at 690-91. 'An accused is entitled " 'not [to] errorless counsel, and not [to] counsel judged ineffective by hindsight, but [to] counsel reasonably likely to render and rendering reasonably effective assistance.' " ' Bui v. State, 717 So.2d 6, 27 (Ala. Crim. App. 1997), quoting Thompson v. State, 615 So.2d 129, 134 (Ala. Crim. App. 1992), quoting in turn Haggard v. Alabama, 550 F.2d 1019, 1022 (5th Cir. 1977)."
Adkins v. State, 930 So.2d 524, 534-35 (Ala. Crim. App. 2001) (on return to third remand).
" ' "[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir. 2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir. 2006) ).' Eley v. Bagley, 604 F.3d 958, 968 (6th Cir. 2010). 'This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.' United States v. Harris, 408 F.3d 186, 191 (5th Cir. 2005)."
*1176 Daniel v. State, 86 So.3d 405, 429-30 (Ala. Crim. App. 2011).
" '[W]hen, as here, counsel has presented a meaningful concept of mitigation, the existence of alternate or additional mitigation theories does not establish ineffective assistance.' State v. Combs, 100 Ohio App. 3d 90, 105, 652 N.E.2d 205, 214 (1994). 'Most capital appeals include an allegation that additional witnesses could have been called. However, the standard of review on appeal is deficient performance plus prejudice.' Malone v. State, 168 P.3d 185, 234-35 (Okla. Crim. App. 2007).''
State v. Gissendanner, [Ms. CR-09-0998, October 23, 2015] --- So.3d ----, ---- (Ala. Crim. App. 2015).
The circuit court did not err in summarily dismissing McMillan's claim that his trial counsel was ineffective for failing to present more evidence of his low IQ. There was no material issue of law or fact that would entitle McMillan to relief; therefore, the circuit court correctly summarily dismissed this claim pursuant to Rule 32.7(d), Ala. R. Crim. P.
B.
McMillan next argues that his trial counsel was ineffective for failing to argue that he is intellectually disabled and that, therefore, pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), it is unconstitutional for him to be sentenced to death.
In Ex parte Perkins, 851 So.2d 453 (Ala. 2002), the Alabama Supreme Court adopted the most liberal definition of mental retardation as that term had been defined by states that had enacted legislation on the issue. In Alabama, to be deemed mentally deficient the defendant must: (1) have significantly subaverage intellectual functioning (an IQ of 70 or below); (2) have significant defects in adaptive behavior; and (3) the two factors must have manifested themselves before the defendant attained the age of 18 years old. "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Atkins v. Virginia, 536 U.S. at 317.
In addition to the circuit court's findings quoted in Part II.A of this opinion, the circuit court stated:
"As part of the court-ordered evaluation in this case, McMillan was evaluated for the presence of mental retardation. McMillan's full-scale IQ was measured at 76, above the 75 'cut-off' that explicitly was not addressed in Hall v. Florida, [ 572 U.S. 701], 134 S.Ct. 1986[ 188 L.Ed.2d 1007] (2014) (finding unconstitutional a bright-line cutoff of a 70 IQ score that does not take into account the standard error of measurement). Here, even taking into account the standard error of measurement, McMillan's score would have remained above the generally accepted score of 70 (two standard deviations below 100) that constitutes the intelligence quotient portion of a mental retardation analysis. And that would assume the largest standard error of measurement operating such as to overestimate McMillan's intelligence (i.e., even if McMillan's IQ was overstated by the maximum 5 points of the ordinary standard error of measurement, his IQ would still be 71). The fact that McMillan's full-scale IQ score placed him higher than a 70, even taking into account the standard error of measurement, constituted a reasonable basis for competent attorneys to conclude that pursuing a mental retardation defense would have been unfruitful, especially in the face of the evidence in this case *1177 providing an alternative mitigation strategy."
(C. 1443-44.)
As stated above, McMillan underwent a mental evaluation before trial by Dr. Karl Kirkland. Dr. Kirkland found that McMillan was not mildly mentally retarded and that he had an IQ of 76. Counsel acted reasonably in relying on Dr. Kirkland's findings concerning McMillan's mental health.
"[T]rial counsel had no reason to retain another psychologist to dispute the first expert's findings. 'A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.' State v. Combs, 100 Ohio App.3d 90, 103, 652 N.E.2d 205, 213 (1994). See also State v. Frogge, 359 N.C. 228, 244-45, 607 S.E.2d 627, 637 (2005). 'Counsel is not ineffective for failing to shop around for additional experts.' Smulls v. State, 71 S.W.3d 138, 156 (Mo. 2002). 'Counsel is not required to "continue looking for experts just because the one he has consulted gave an unfavorable opinion." Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995).' Walls v. Bowersox, 151 F.3d 827, 835 (8th Cir. 1998)."
Waldrop v. State, 987 So.2d 1186, 1193 (Ala. Crim. App. 2007). "[D]efense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire." Darling v. State, 966 So.2d 366, 377 (Fla. 2007).
The circuit court did not abuse its discretion in summarily dismissing this claim because it failed to state a material issue of fact or law that would entitle McMillan to relief. See Rule 32.7(d), Ala. R. Crim. P.
C.
McMillan further argues that his trial counsel was ineffective for failing to investigate and to present evidence of his neurological disorders. Specifically, he argues that his trial counsel should have investigated and presented evidence that he suffered from fetal alcohol syndrome and a traumatic brain injury.
The circuit court made the following findings on this claim:
"First, counsel provided reasonable, competent professional assistance in this case by obtaining school records, DHR records, court records pertaining to the abuse and neglect suffered by McMillan and by obtaining a board-certified forensic psychologist with whom to consult. Counsel also located and consulted with a social worker who twice worked with McMillan during his time with DHR. Counsel also utilized the services of a licensed professional counselor who was familiar with DHR's operating procedures and was well-equipped to review and interpret the records obtained during the mitigation investigation.
"While the amended petition faults trial counsel for not researching fetal alcohol syndrome, it was the expert mental health professionals whose responsibility it was to determine what conditions might be present and to determine an appropriate course of action. Here, the record establishes that Dr. Ackerson did not refer McMillan to a neurologist or psychiatrist for further testing, even though she had previously done so in other cases when it was appropriate. If Dr. Ackerson, a trained board-certified psychologist and Alabama forensic examiner, did not believe further referrals were necessary in this case, trial counsel were not deficient if they relied on that fact. Dr. Ackerson's invoice indicates she spent three hours conducting psychological *1178 and forensic assessments of McMillan and two hours of collateral interviews and ten hours of document review in this case. Further, Dr. Kirkland's court-ordered examination did not contain any suggestion that further testing would be needed; thus, that source of information did not put counsel on notice of any need to undertake further action. See Pooler v. Secretary, Florida Dept. of Corrections, 702 F.3d 1252, 1273 (11th Cir. 2012) (In some instances, defense counsel can reasonably rely on court-appointed experts even where they do not seek a defense expert for a second opinion).
"....
"Unlike the situation in Rompilla v. Beard, 545 U.S. 374 (2005), this claim does not plead facts describing a situation where counsel failed to obtain and review a file that contained readily, usable information. None of the files introduced at trial describe McMillan as having been diagnosed with fetal alcohol syndrome, nor does the petition allege that documents existed containing such a diagnosis. Instead, the petition alleges trial counsel were ineffective for failing to cobble together bits of information in order to try and create a medical diagnosis that the court-appointed expert did not note and which the defense expert did not feel was significant enough to warrant referral to a neuropsychologist.
"Based on the record before this Court, McMillan cannot prevail even if the facts in his amended petition are taken as true. Trial counsel obtained records, spoke to family members, hired a mitigation investigator, obtained the services of Dr. Ackerson, spoke to a former social worker who knew McMillan during his time with DHR and obtained the benefit of a court-ordered evaluation. The penalty phase of trial shows that a great deal of effort went into preparing for the penalty phase and crafting an appropriate strategy. Trial counsel's performance in this matter was within the level of reasonable performance that is required by Strickland [v. Washington, 466 U.S. 668 (1984) ].... The petition does not uncover the existence of documents which went undiscovered by trial counsel or that clearly document the existence of medical conditions that were overlooked by defense counsel. Instead, McMillan asserts his defense team should have been more creative in coming up with new diagnosis previously unmade during his life. Such a claim, in this case, does not constitute ineffectiveness under either prong of the Strickland analysis. As such, this claim is dismissed.''
(C. 1465-69.)
As the State correctly argues, McMillan's entire pleading on this claim is based on speculation. McMillan did not plead in either his original petition or his amended petition that he actually suffered from fetal alcohol syndrome or that he had been diagnosed with traumatic brain injury. Indeed, the entire argument is premised on the fact that counsel "should have investigated" and "might have found" that McMillan suffered from those conditions. "[B]y presenting pure speculation and failing to plead any specific facts regarding [this issue] ... [the appellant] failed to plead facts supporting a general claim of prejudice." Morris v. State, [Ms. CR-11-1925, April 29, 2016] --- So.3d ----, ---- (Ala. Crim. App. 2016). "Ineffective assistance of counsel claims are not built on retrospective speculation ...." Bone v. State, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). "It is well established that, in a claim of ineffective assistance of counsel, '[m]ere conjecture and speculation are not enough to support a showing of prejudice.' "
*1179 Elsey v. Commissioner of Corr., 126 Conn.App. 144, 166, 10 A.3d 578, 593 (2011) (citation omitted). This circuit court properly dismissed this claim because no material issue of law or fact exists that would entitle McMillan to relief. See Rule 32.7(d), Ala. R. Crim. P.
D.
McMillan further argues that his trial counsel was ineffective for failing to present evidence of his young age as a mitigating circumstance and of how his age affected his mental capabilities.
The circuit court made the following findings on this claim:
"Based on the record of trial, it is clear that defense counsel adopted a reasonable mitigation strategy that argued that the abuse and neglect suffered during McMillan's childhood likely caused him to suffer from behavioral problems; for example, from lack of attachment and nurturing. Counsel further adopted a strategy that then shifted the focus to DHR as a culpable party for failing to provide for treatment for McMillan's behavioral problems. Explaining McMillan's behavioral problems as a result of his incomplete frontal lobe development due to age, as is alleged by McMillan in his petition, could have shifted focus away from the neglect and abuse that was highlighted in the mitigation case as the likely culprit, and would have lessened the culpability defense counsel sought to assign to DHR, as treatment and counseling arguably would have done little to speed along McMillan's brain's development. Under the circumstances and considering the strategy actually employed by defense counsel, reasonably competent counsel could have elected to forgo seeking to argue age and 'frontal lobe development' in this case.
"This is not to say that the mitigation theory advanced by McMillan through the facts averred in his amended petition is not reasonable. Another set of attorneys, with the same competencies of Mr. [Bill] Lewis and Mr. [Kendrick] James, could reasonably decide that an argument such as that set forth in McMillan's amended petition is the proper way forward if this case were to be tried again. But this does not mean that defense counsel's failure to advance this theory at trial was deficient. Again, the question is whether the approach taken by McMillan's trial counsel falls within the wide range of professionally reasonable assistance that is permitted (or acceptable) under the Sixth Amendment. Here, it does. Accordingly, the facts in the petition, if true, would not result in a finding that counsel were deficient for not seeking out MRI studies or hiring a different psychologist. For this reason, this claim is dismissed."
(C. 1463-65.)
The circuit court did find as a statutory mitigating circumstance that McMillan was only 18 years of age at the time of the murder. Also, there was a great deal of mitigating evidence offered at sentencing. As did the circuit court, we agree that McMillan could establish no prejudice in regard to this claim.
" '[W]hen, as here, counsel has presented a meaningful concept of mitigation, the existence of alternate or additional mitigation theories does not establish ineffective assistance.' State v. Combs, 100 Ohio App.3d 90, 105, 652 N.E.2d 205, 214 (1994)."
State v. Gissendanner, [Ms. CR-09-0998, October 23, 2015] --- So.3d ----, ---- (Ala. Crim. App. 2015).
The circuit court committed no error in summarily dismissing this claim because there was no material issue of fact or law that would entitle McMillan to relief. See Rule 32.7(d), Ala. R. Crim. P.
*1180 E.
McMillan next argues that counsel was ineffective for failing to investigate and to present rebuttal evidence at sentencing concerning his prior conviction for assault in the third degree. McMillan asserts that trial counsel was aware that the State intended to rely on that conviction in the penalty phase of McMillan's capital-murder trial to negate the mitigating circumstance that McMillan had no significant history of prior criminal activity. McMillan cites Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), in support of his argument.
The record shows that at the penalty phase the State presented testimony that McMillan had one prior misdemeanor conviction for assault in the third degree for assaulting Carlton Raspberry. At the penalty phase, the jury recommended, by a vote of 8 to 4, that McMillan be sentenced to life imprisonment without the possibility of parole, and the circuit court found as a statutory mitigating circumstance that McMillan had no significant history of prior criminal activity.
The circuit court made the following findings related to this claim:
"This claim can be dismissed for failing to state a material issue of law or fact under Strickland [v. Washington, 466 U.S. 668 (1984),] as to either deficient performance or prejudice.
"As to deficient performance, the record establishes that McMillan's counsel did, in fact, take steps to investigate McMillan's prior assault conviction. Defense counsel represented to the Court that he intended to go to Dallas County and obtain the file well before the trial began. Counsel further noted he was concerned with determining whether McMillan had been represented by counsel. The record shows that ultimately counsel spoke to the court clerk on the phone and sent his investigator to Dallas County to obtain the file, but that it could not be located. That same day, the State provided the documents in its possession regarding that conviction. Defense counsel further participated in a hearing held to determine whether [McMillan] was the person named in the court records pertaining to the assault conviction. During that hearing, defense counsel reviewed sheriff's department documents (arrest report and offense report) pertaining to McMillan's assault case in open court. Counsel for McMillan also saw his booking photograph from that arrest during the hearing. McMillan's counsel were also in court, prior to trial, when a certified copy of McMillan's Assault III conviction was introduced.
"Counsel's closing argument establishes that the Assault III case file was reviewed prior to trial. As counsel for McMillan argued, 'One assault conviction, misdemeanor, not represented by an attorney, no jail time, no court costs, no fine.' This statement establishes that McMillan's counsel were paying attention when these materials were reviewed and discussed in open court prior to trial.
"McMillan's actual claim is specific: he alleges defense counsel were ineffective for failing to seek out and contact McMillan's victim from the assault case for which he was convicted. McMillan's claim goes too far. Strickland required that McMillan's attorneys make a reasonable investigation into 'possible mitigating factors and ma[k]e a reasonable effort to present mitigating evidence to the sentencing court.' Anderson v. Secretary, Fla. Dept. Of Corrections, 752 F.3d 881, 904 (11th Cir. 2014) (quoting Henyard v. McDonough, 459 F.3d 1217, 1242 (11th Cir. 2006) ). McMillan's attorneys went beyond satisfying this duty as noted by the record of his trial. Further, *1181 seeking out the victim of a crime of violence committed by one's client, a capital murder suspect, for mitigation purposes cannot be said to be an act that all reasonable attorneys would undertake in the hope of finding mitigating evidence, especially where promising avenues of mitigation investigation already exist. McMillan offers no reason counsel would have seen any potential mitigating value in seeking out this particular victim of McMillan's conduct. Instead, the petition treats the issue as if counsel had a duty to automatically seek and find the victim of McMillan's assault case yet the prevailing norms in Elmore County, Alabama in 2008 and 2009 simply did not require such an act. See also, Cullen v. Pinholster, [563 U.S. 170,] 131 S.Ct. 1388, 1406-1407 (2011) (' Strickland itself rejected the notion that the same investigation will be required in every case.').
"Further, [Carlton] Raspberry was the victim of the assault for which McMillan was convicted, but another victim exists whose assault case was dismissed as part of a plea agreement. Thomas Grasso was violently assaulted by McMillan, with the police report noting: 'Grasso advised me that McMillan hit him in the head and back several times because McMillan said that he stabbed him in the leg with a crocheting needle. Grasso said he did not do what McMillan said he did and McMillan had no reason to strike him with his fists and [illegible] McMillan is a bully.' Had McMillan gone beyond the mere fact of the conviction, to which the state was limited by the Alabama Rules of Evidence, the State could have rebutted any testimony by Raspberry through testimony by Grasso. The existence of two assaults at the SafetyNet program, instead of only one as indicated by admissible convictions, would have been very prejudicial to McMillan. Obviously, reasonable trial counsel could decide that any strategy that could open the door to such damaging testimony should be avoided.
"McMillan's amended petition, even if the facts are accepted as true, does not establish that his counsel had a duty to seek out and interview the victim of a violent assault committed by McMillan in the hopes of findings mitigating evidence. This is doubly so where there is a second victim and calling one would make the other's testimony relevant as rebuttal.
"This claim is nothing like Rompilla v. Beard, 545 U.S. 374 (2005), were counsel failed to obtain readily available information from a public file knowing that such information would be used by the prosecution against their client. Here, the record plainly establishes that McMillan's counsel satisfied that duty as set forth in Rompilla. Instead, McMillan faults counsel for not squandering investigative resources on what most reasonable attorneys would conclude is a useless endeavor as far as uncovering mitigation evidence goes. Further, the amended petition ignores the fact that even had they found Raspberry a favorable witness, calling him to testify would expose McMillan to rebuttal testimony regarding a second assault he committed at the SafetyNet program. Even Rompilla discounts the theory advanced by McMillan. See Rompilla, 545 U.S. at 389 ('Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there.'). This claim, then, is dismissed."
(C. 1458-63.)
In Rompilla, the United States Supreme Court held that counsel was ineffective for *1182 failing to review the file of the defendant's prior conviction when that conviction formed the basis of an aggravating circumstance that supported the death penalty:
"It is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize."
545 U.S. at 385-86. The Supreme Court did not hold that an attorney's conduct was unreasonable if that attorney did not personally interview the victim of the defendant's prior conviction. Indeed, the Supreme Court noted that reasonable efforts would have included obtaining the court file on the prior conviction. 545 U.S. at 386.
The facts of this case are similar to the facts presented to the Indiana Supreme Court in Ward v. State, 969 N.E.2d 46, 56-57 (Ind. 2012). The Indiana Supreme Court discussed Rompilla and subsequent decisions by the United States Supreme Court and stated:
"In Rompilla v. Beard, [ 545 U.S. 374 (2005),] trial counsel failed to examine the court file on Rompilla's prior convictions despite the fact that they knew that the prosecution planned to seek the death penalty by proving Rompilla had a significant history of felony convictions. 545 U.S. 374, 383-86, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). In Porter v. McCollum, trial counsel did not interview any witnesses or gather any records and thereby failed to uncover any evidence of Porter's mental health or mental impairment, his family background, or his military service. 558 U.S. 30, 130 S.Ct. 447, 453, 175 L.Ed.2d 398 (2009) (per curiam). And in Sears v. Upton, trial counsel failed to uncover horrific aspects of Sears's family and social life, that he was learning disabled, and that he suffered frontal lobe abnormalities that resulted in substantial cognitive deficits. 561 U.S. 945, 130 S.Ct. 3259, 3262-64, 177 L.Ed.2d 1025 (2010) (per curiam) (5-4).
"Unlike these cases, it is clear from the record here that trial counsel conducted a reasonable mitigation investigation. They interviewed Ward, his family members, and others who knew him to gain insight into his background and to develop his history; they also gathered records related to his education, his time in prison, and his mental health. Using the ABA [American Bar Association] standards as a guide, we think that the scope of counsel's investigation was reasonable. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7 cmt. (rev. ed. 2003) (noting that among the topics counsel should explore are medical history, family and social history, religious and cultural influences, educational history, military service, employment and training history, and prior adult and juvenile correctional experience); see also Bobby v. Van Hook, 558 U.S. 4, 130 S.Ct. 13, 16-17, 175 L.Ed.2d 255 (2009) (per curiam) (restatements of professional standards can be useful guides as to what is reasonable); cf. Nix v. Whiteside, 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) (cautioning *1183 courts not to 'constitutionalize particular standards of professional conduct'). And although they may have wanted to uncover certain mitigating evidence or may have intended to interview one potential mitigation witness in particular, they were not constitutionally deficient for failing to do so on this record. Cf. Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) ('[E]ven if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.' (citations omitted)). Ward's trial counsel simply did not make 'errors so serious that [they were] not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Strickland [v. Washington ], 466 U.S. [668] at 687, 104 S.Ct. 2052 [ (1984) ]."
Ward v. State, 969 N.E.2d 46, 56-57 (Ind. 2012).
Here, the record clearly shows that counsel investigated McMillan's prior conviction, that counsel attempted to obtain the file of the case but it could not be located, that counsel then obtained the State's records on the prior conviction, and that counsel also obtained law-enforcement records relating to the conviction. Trial counsel was well versed on the facts surrounding McMillan's prior conviction before his trial and their actions in investigating the prior conviction were reasonable. See Rompilla, supra. Moreover, the circuit court found that McMillan had no significant history of prior criminal activity. Clearly, McMillan failed to plead how he was prejudiced by counsel's failure to go even further and interview the victim of McMillan's prior assault conviction.
The circuit court correctly summarily dismissed this claim pursuant to Rule 32.7(d), Ala. R. Crim. P., because there was no material issue of fact or law that would entitle McMillan to relief, and any further proceedings on this issue would have been futile.
III.
McMillan next argues that his due-process rights were violated because, he says, his postconviction petition was considered by a judge whose "impartiality might reasonably be questioned." (McMillan's brief at p. 71.) Specifically, he argues that the circuit judge, the Honorable John Bush, had already prejudged the issue of ineffectiveness of counsel and that Judge Bush had "close ties with McMillan's trial counsel." (McMillan's brief, p. 71.)
The record shows that McMillan moved that Judge Bush recuse himself from considering McMillan's postconviction petition and that he transfer the case to another judge in that circuit. (R. 536-50.) In the motion, McMillan argued that Judge Bush had stated in McMillan's sentencing order that "McMillan's attorneys provided effective assistance" before, he says, the issue of the effectiveness of counsel was even presented to that court. He further argued that both of McMillan's trial attorneys "are linked with Judge Bush by professional and political ties" because, he says, they gave "significant financial contributions to his contested election campaign." It appears that one attorney gave Judge Bush a campaign contribution of $1,000 for his reelection campaign and the other attorney gave him $500. McMillan then filed a motion for a "fair procedure" in disposing of the motion to recuse by transferring that motion to another judge for that judge to consider. (C. 590-602.) The State filed a motion opposing McMillan's motion to recuse. (C. 604-14.) Judge Bush denied the motion to recuse. (C. 622.) In the order Judge Bush stated:
"The preferred procedure in Alabama is for the trial judge to hear and decide petitions for postconviction relief in *1184 cases that were initially heard by the trial judge. This Court finds no reasonable basis from deviating from that procedure. The issues raised by the petitioner in no way affect the undersigned's ability to be fair and impartial in evaluating the claims raised in the instant 'Rule 32' petition nor do they show any prejudice by this court against this petition."
(C. 622.)
The United States Supreme Court in Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), considered whether an appellate judge should have recused himself from a case after one of the parties had contributed $3,000,000 to his election campaign. The Supreme Court held:
"[T]here is a serious risk of actual bias-based on objective and reasonable perceptions-when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent. The inquiry centers on the contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election."
556 U.S. at 884, 129 S.Ct. 2252. "The [ Caperton ] Court's holding, however, was narrow. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 886. It noted the 'extreme facts' of that case and limited its holding to the 'extraordinary situation' where the 'probability of actual bias rises to an unconstitutional level.' Id." United States v. Rodriguez, 627 F.3d 1372, 1382 (11th Cir. 2010). See also Williams-Yulee v. Florida Bar, --- U.S. ----, 135 S.Ct. 1656, 191 L.Ed.2d 570 (2015).
This Court's records reflect that in January 2015 McMillan filed a petition for a writ of mandamus requesting that this Court direct Judge Bush to recuse himself from McMillan's postconviction proceedings. In our order declining to issue the writ, we stated:
" Rule 32.6(d), Ala. R. Crim. P., provides that a Rule 32 petition 'shall be assigned to the sentencing judge where possible, but for good cause the proceeding may be assigned or transferred to another judge.' See also H. Maddox, Alabama Rules of Criminal Procedure, § 32.6(d), p. 988 (3d ed. 1999). When reviewing a recusal motion: 'The question is not whether [Judge Bush] was impartial in fact, but whether another person, knowing all of the circumstances, might reasonably question the judge's impartiality-whether there is an appearance of impropriety.' Ex parte Duncan, 638 So.2d 1332, 1334 (Ala. 1994). The mere fact that Judge Bush made a comment in his sentencing order on the performance of trial counsel does not mean that Judge Bush is incapable of rendering a fair decision on McMillan's claims of ineffective assistance of counsel in his postconviction proceeding. This Court has previously denied a petition for a writ of mandamus alleging this identical ground for recusal. See Ex parte Harris, (CR-10-1651, September 16, 2011) [114 So.3d 176 (Ala.Crim.App. 2011)(table) ].[2] McMillan failed to establish good cause for Judge Bush's recusal on this basis.
"Second, the United States Supreme Court in Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868 (2009), addressed the circumstances that warrant a judge recusing when a defendant or attorney have worked on or contributed to that judge's campaign. In Caperton, one of the parties contributed a total of $3,000,000 to the judge's campaign. The court stated: '[T]here is a serious risk of actual bias-based on objective and reasonable perception-when a person with *1185 a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.' 556 U.S. at 884. (Emphasis added.) 'The inquiry centers on the contribution's relative size in comparison to the total amount of money contributed to the campaign, the total amount spent in the election, and the apparent effect such contribution had on the outcome of the election.' Caperton, 556 U.S. at 884. McMillan alleges that in the 2006 judicial election in Elmore County one of his trial attorneys contributed $1,000 to Judge Bush's campaign and the other attorney contributed $500. The exhibits attached to this petition reflect that Judge Bush received $59,000 in contributions. We do not consider the contributions at issue in this case to meet the threshold recognized in Caperton-the contributions were not 'significant.'
"[2] A similar mandamus petition was filed in the Alabama Supreme Court and also denied. See Ex parte Harris, (Ms. 1101486, October 13, 2011)."
Ex parte McMillan (No. 14-0498, January 29, 2015), 207 So.3d 854 (Ala. Crim. App. 2015) (table).
This Court recognizes that the filing of a petition for a writ of mandamus does not preclude an appellant from raising the same issue on appeal. See Ex parte Crawford, 686 So.2d 196, 198 (Ala. 1996) ("While a mandamus petition is a proper method for obtaining appellate review on this issue, it is not the sole method for obtaining it."). Indeed, this is true because the burden of establishing the prerequisites for the issuance of a writ of mandamus are higher than those that warrant relief on appeal. However, under any standard of review, we hold that McMillan is due no relief on this claim. We affirm the grounds for denial set out in the above-quoted order. For these reasons, McMillan is due no relief on this claim.
IV.
McMillan next argues that the circuit court erred in declining to extend his right to counsel to the filing of the petitions for the writ of mandamus McMillan's postconviction counsel filed in both this Court and the Alabama Supreme Court.
McMillan's postconviction counsel moved that the scope of his appointment of counsel include counsel's work on the mandamus petitions filed in the two appellate courts. (C. 1648.) The circuit court denied that motion. (C. 1668.) The record shows that the circuit court issued the following order regarding the appointment of counsel in the postconviction proceedings.
"Upon consideration of petitioner Calvin McMillan's motion for appointment of counsel, the motion is hereby granted....
"This appointment shall apply to the filing, argument and representation on the Rule 32 petition and amended Rule 32 petition only and any appeal from this Court's ruling(s) thereon. It does not apply to the Motion to recuse and/or petitions for writ of mandamus."
(C. 1676.)
" 'Mandamus is a discretionary writ that is appropriate where a court has exceeded its jurisdiction or authority and where there is no remedy through appeal.' " State ex rel. Joyce v. Mullen, 503 S.W.3d 330, 334 (Mo. Ct. App. 2016) (quoting State ex rel. Poucher v. Vincent, 258 S.W.3d 62, 64 (Mo. 2008) ). The United States Supreme Court has "rejected suggestions that [it] establish a right to counsel on discretionary appeals." Pennsylvania v. Finley, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). The right to counsel does not extend to postconviction *1186 proceedings. See Pennsylvania v. Finley, supra.
Because there is no right to counsel for the filing of a mandamus petition, a discretionary review, the circuit court did not abuse its discretion in declining to extend the scope of McMillan's appointment of counsel to include the filing of extraordinary writs. For these reasons, McMillan is due no relief on this claim.
V.
McMillan next argues that the circuit court erred in summarily dismissing his claim that his trial counsel was ineffective for failing to investigate and to present evidence in the penalty phase regarding the instability of his childhood. Specifically, he argues that trial counsel failed to conduct a thorough investigation and present an even more detailed account of his childhood.
McMillan pleaded the following in his amended postconviction petition:
"Here, counsel's investigation and presentation of McMillan's instability was objectively unreasonable. Counsel did not interview the vast majority of McMillan's former foster parents.... Trial counsel also failed to interview most of the social workers who worked with McMillan and staff of the facilities where McMillan lived. If they had done those things, they could have developed a far more detailed and vivid presentation demonstrating that McMillan grew up in a constant state of instability and without any steady, positive influences."
(C. 472-73.) McMillan argued that more detailed testimony should have been presented concerning the 25 different foster residences he lived in and the numerous programs he participated in while in the custody of DHR.
The circuit court made the following findings of fact on this claim:
"At trial, McMillan's sister Ella Torrence testified about McMillan's family situation at the time of his birth in 1988. This included testimony that she moved in with her aunt Carol Weaver, who she testified she calls 'Momma'-because her mother was going to give the children up to foster care. She further testified that her mother moved from New York to Shorter, Alabama, shortly after becoming pregnant with McMillan. She further testified that because of her mother's drug and alcohol use, her siblings (including McMillan) were moved into foster care shortly after his birth and while he was still an infant. This lasted until 1991 when McMillan returned to his mother in Waugh, Alabama. She testified this living arrangement included the presence of Willie Ford. Ella Torrence further testified that the children went to abuse shelters during this time, but that they would always go back to Ford's home. Torrence stated that this back-and-forth arrangement continued until about 1998.
"Torrence testified that in 1998 her mother and Ford were arrested and the children were removed from the home. At this point, McMillan began going into different foster homes. Torrence also stated that McMillan lived with her in 2006 and 2007 in Montgomery, Alabama, but that he was not living with her at the time of the murder of Martin. At the time of the murder Torrence testified McMillan was living on his own.
"McMillan's Aunt Carol Weaver repeated much of the information provided by Torrence, including the stays at the battered women's shelter with the children. Weaver also testified that she raised the children for a period of time during the 1990's with the assistance of [the Department of Human Resources].
"Teal Dick was a major defense mitigation witness on the issue of the instability *1187 in McMillan's childhood living arrangements. Dick also confirmed that the children lived in a trailer with Ford in Waugh, Alabama, from 1992 through 1998. He also discussed the stays at the Sunshine Center (battered women's shelter), including a stay during July 1995. Dick noted that during the time the children stayed at the Waugh residence, they would periodically have to stay with Carol Weaver. Dick discussed one occasion in June 1997 when the children had to stay at a motel because the shelter was full. Teal also pointed out references in a DHR record showing that the children stayed with their mother at a shelter for 92 days between May and August 1997.
"Dick testified that McMillan was moved from 'place to place to place to place' during his childhood, going through five social workers during the time period. He noted that McMillan went through 25 or 26 placements, 'based on how you count.' The first placement was with Carol Weaver after the arrests of Ford and McMillan. Dick testified that the placement with Weaver lasted ten months. After Weaver, McMillan was placed with Macon County DHR. Next, Dick referenced McMillan's placement in the State Alternatives for Families and Youth Center in 2001. McMillan went through approximately twenty homes after that placement. Finally, Dick noted that McMillan was emancipated in January 2007.
"Emma Cosby testified that she was a social worker who supervised McMillan during a placement in the home of [W.B.] in the 2000-2001 time frame. Cosby testified that prior to the placement with [W.B.], McMillan had been placed in another home by social worker Jamie Fulton. Cosby again came into contact with McMillan in approximately 2007 when he was placed in the SafetyNet residential program.
"....
"In this case, the record establishes that defense counsel and their experts investigated and familiarized themselves withe McMillan's 25 or 30 placements, 'depending on how you count.' Afterwards, counsel chose to present two family members, two experts, McMillan's estranged biological father, and a social worker who had been the victim of McMillan's behavioral problems in the form of an explicit, violent threat. In essence, the defense used Emma Cosby to 'soften' the impact of McMillan's behavioral problems evidence in a document that they needed to carry out their strategy of shifting the focus of the penalty phase from McMillan to what they asserted were failings and shortcomings by DHR. Here, as in [ Bobby v. Van Hook, 558 U.S. 4, 13 (2009) ], it was not unreasonable for defense counsel to not identify every single person with whom McMillan was placed and no facts averred in the amended petition, if true, would establish otherwise."
(C. 1469-74.)
Here, a great deal of testimony was presented concerning McMillan's unstable home environment. Testimony was admitted through several witnesses that McMillan had been in many different foster homes and that his home environment was marked by neglect, abuse, and instability. Teal Dick testified that McMillan had been assigned five different social workers in a 5- or 7-year period and in that same time he had been placed in 25 or 26 different foster homes. Emma Cosby testified concerning several of the foster homes. McMillan's sister also detailed McMillan's unstable childhood.
" ' "[T]he failure to present additional mitigating evidence that is merely cumulative of that already presented does not *1188 rise to the level of a constitutional violation." Nields v. Bradshaw, 482 F.3d 442, 454 (6th Cir. 2007) (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir. 2006) ).' Eley v. Bagley, 604 F.3d 958, 968 (6th Cir. 2010). 'This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel.' United States v. Harris, 408 F.3d 186, 191 (5th Cir. 2005). 'Although as an afterthought this [defendant's father] provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.' Darling v. State, 966 So.2d 366, 377 (Fla. 2007).''
Daniel v. State, 86 So.3d 405, 430 (Ala. Crim. App. 2011). "It is true that counsel will not be held to be ineffective for failing to present evidence that is duplicative of evidence presented at the penalty phase." Robinson v. State, 95 So.3d 171, 180 (Ala. 2012). "That the lawyers ... did not track down every possible expert or piece of evidence available, does not render their assistance ineffective." Parrish v. Commonwealth, 272 S.W.3d 161, 170 (Ky. 2008).
As the United States Supreme Court stated in Bobby v. Van Hook, 558 U.S. 4 (2009):
"Despite all the mitigating evidence the defense did present, Van Hook and the Court of Appeals fault his counsel for failing to find more. What his counsel did discover, the argument goes, gave them 'reason to suspect that much worse details existed,' and that suspicion should have prompted them to interview other family members-his stepsister, two uncles, and two aunts-as well as a psychiatrist who once treated his mother, all of whom 'could have helped his counsel narrate the true story of Van Hook's childhood experiences.' [ Van Hook v. Anderson,] 560 F.3d [523] at 528 [ (6th Cir. 2009) ]. But there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties. The ABA Standards prevailing at the time called for Van Hook's counsel to cover several broad categories of mitigating evidence, see 1 ABA Standards 4-4.1, comment., at 4-55, which they did. And given all the evidence they unearthed from those closest to Van Hook's upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member or every therapist who once treated his parents. This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, cf. Wiggins [v. Smith ], 539 U.S., [510] at 525, 123 S.Ct. 2527 [ (2003) ], or would have been apparent from documents any reasonable attorney would have obtained, cf. Rompilla v. Beard, 545 U.S. 374, 389-393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). It is instead a case, like Strickland itself, in which defense counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.' 466 U.S. at 699, 104 S.Ct. 2052."
558 U.S. at 11-12.
The circuit court correctly found that this issue was due to be summarily dismissed because no issue of law or fact exists that would entitle McMillan to relief. See Rule 32.7(d), Ala. R. Crim. P.
VI.
McMillan next argues that the circuit court erred in summarily dismissing *1189 his claim that his trial counsel was ineffective for failing to object to allegedly improper arguments made by the prosecutor in opening and closing statements.
" '[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made. Effectiveness of counsel is not measured by whether counsel objected to every question and moved to strike every answer.' Brooks v. State, 456 So.2d 1142, 1145 (Ala. Crim. App. 1984)."
Hooks v. State, 21 So.3d 772, 789 (Ala. Crim. App. 2008).
" '[I]nterruptions of arguments, either by opposing counsel or the presiding judge, are matters to be approached cautiously.' United States v. Young, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). 'A decision not to object to a closing argument is a matter of trial strategy.' Drew v. Collins, 964 F.2d 411, 423 (5th Cir. 1992). To constitute error a prosecutor's argument must have 'so infected the trial with unfairness as to make the resulting [verdict] a denial of due process.' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d. 144 (1986)."
Benjamin v. State, 156 So.3d 424, 454 (Ala. Crim. App. 2013). "Merely because a trial counsel failed to object to everything objectionable, does to equate to incompetence.... 'In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes.' " Greer v. State, 406 S.W.3d 100, 104 (Mo. Ct. App. 2013). "To justify postconviction relief the failure to object must have been of such character as to deprive the movant substantially of his right to a fair trial." State v. Kennedy, 842 S.W.2d 937, 946 (Mo. Ct. App. 1992). "[T]he failure to object to argument that is not improper does not constitute ineffective assistance of counsel. Even the failure to object to improper jury argument does not ordinarily reflect ineffective assistance." Davis v. State, 830 S.W.2d 762, 766 (Tex. Ct. App. 1992).
More importantly, "the jury's recommendation of life imprisonment without parole negates [the appellant's] showing that he was prejudiced by counsel's performance." Boyd v. State, 746 So.2d 364, 389 (Ala. Crim. App. 1999).
A.
First, McMillan argues that the circuit court erred in dismissing his claim that his trial counsel was ineffective for failing to object to the prosecutor's argument in closing in the penalty phase. Specifically, McMillan challenges the following argument:
"So I just want to remind you that we're at the point now where the decision you make is not a personal one. As you sit as a court of law you are a jury of 12, a fair cross-section of this community, you are the conscience of this community. You are not an individual. You're 12 people who represent the residents of Elmore County, Alabama."
(Trial Record, R. 1732.) McMillan argues that the argument violates the United States Supreme Court's holding in Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).
"The United States Supreme Court in Mills v. Maryland, held that if there was a substantial probability that jury instructions in the penalty phase implied that a finding on a mitigating circumstance must be unanimous, then the death sentence is due to be vacated." Blackmon v. State, 7 So.3d 397, 437 (Ala. Crim. App. 2005).
The circuit court stated the following concerning this claim:
"This claim is summarily dismissed because the arguments of the State were *1190 appropriate calls for law enforcement and justice and not objectionable....
"Further, McMillan cannot establish prejudice under Strickland [v. Washington, 466 U.S. 668 (1984),] as to this claim. When the complained of comments are considered in the context of the entire argument of the State, McMillan's prejudice argument evaporates. The State began its penalty phase closing argument by 'emphasizing' to the jury that the 'decision is a legal and a factual one in accordance with the instructions of the Court.' Counsel for the State then reminded the jury that their decision required a weighing of the aggravating and mitigating circumstances. Counsel told the jurors that the amount of weight they gave the proven aggravating circumstance 'is solely yours.' Counsel for the State informed the jury that they were required to consider any mitigation offered by McMillan, but that only they could determine whether it was mitigating or the weight to be assigned to such circumstances. In conclusion, the State argued:
" 'And the law says, as we talked about earlier, if the aggravation outweighs the mitigation, it is your role, as duly impaneled jurors who have sworn an oath, to follow the instructions of the Court, follow the law, and apply it to the facts and return a verdict based on that. And if the aggravation outweighs the mitigation, it's death. Like I said, it's not an emotional or a political issue, it is a legal issue that will be resolved solely by your determination of the facts.'
"(R. 1755.) Importantly, the prosecutor asserted to the jury, 'I'm just going to ask you to listen to the instructions of the Judge. This isn't a personal issue, it's not a political issue, it's a legal issue and a factual issue that you must discuss amongst yourselves and you must deliberate. Deliberate means that you consider everyone's views and review the evidence, you don't shut yourselves off from everybody else, because that turns into a court of men and women and of individuals and not a court of law.' In context, it cannot be said that the failure to object to the argument identified by McMillan was prejudicial under Strickland."
(C. 1477-78.)
We agree with the circuit court that the prosecutor's argument, taken as a whole, did not imply that all the jurors had to agree in order for a mitigating circumstance to be applied. In fact, the prosecutor urged the jury to follow the circuit court's instruction. "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." Lee v. State, 44 So.3d 1145, 1173 (Ala. Crim. App. 2009). The circuit court correctly summarily dismissed this claim pursuant to Rule 32.7(d), Ala. R. Crim. P.
B.
Second, McMillan argues that his trial counsel was ineffective for failing to object when the prosecutor argued that the State was limited to the number of aggravating circumstances it was permitted to pursue at the penalty phase.
McMillan challenges the following argument:
"By law we're limited to one aggravating circumstance, the fact that Calvin McMillan killed Bryan Martin during a robbery in the first degree. And by your verdict you have already established this aggravating circumstances beyond a reasonable doubt."
(Trial Record, R. 1733.) He argues that the above argument "created the false impression that the case involved one aggravator *1191 because the law only allowed the State to select one, rather than because the case not highly aggravated." (McMillan's brief at p. 82.)
The circuit court made the following findings on this claim:
"The comment of the prosecutor was not objectionable in any way. As such, McMillan's counsel were not deficient for failing to object and McMillan was not prejudiced by the remark.... [T]he Court's instructions further indicated that it was only allowed to consider the murder during the course of a robbery aggravating circumstance. Inasmuch as the trial court stated: 'This aggravating circumstance is included in the list of enumerated statutory aggravating circumstances permitting you to consider death as an available punishment,' any possible error in the 'misstatement' McMillan avers the prosecution made was cured."
(C. 1479-80.) We agree with the circuit court. "[T]he failure to object to argument that is not improper does not constitute ineffective assistance of counsel." Davis v. State, 830 S.W.2d 762, 766 (Tex. Ct. App. 1992). "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." Lee v. State, 44 So.3d 1145, 1173 (Ala. Crim. App. 2009).
The circuit court did not err in summarily dismissing this claim pursuant to Rule 32.7(d), Ala. R. Crim. P., because there was no material issue of fact or law that would entitle McMillan to relief.
C.
McMillan next argues that his trial counsel was ineffective for failing to object when the prosecutor argued that he was "dangerous." Specifically, he asserts that the prosecutor argued that his prior conviction for assault in the third degree was a violent crime and that McMillan was a dangerous person. He asserts that the argument was improper because, he says, under Alabama law future dangerousness is not a proper aggravating factor at the penalty phase of a capital-murder trial.
The circuit court stated the following concerning this claim:
"Here, the context of the prosecutor's arguments reveal that the state never once argued future dangerousness as an aggravating circumstance. In fact, as noted in the State's motion to dismiss, the absurdity of [McMillan's] position is most apparent when compared to the previous claim in the petition criticizing the State for truthfully informing the jury that they could only consider a single aggravating circumstance.
"In context, it is clear the State was arguing that the statutory mitigating circumstance of lack of 'significant history of criminal activity' was either diminished or negated by the referenced evidence. Further, the State's intent in offering this argument is self-evident from the argument preceding the comments contested by McMillan:
" 'Mitigating. He is permitted to offer for your consideration any aspect of his character or any circumstances of the offense he chooses to offer ... but only you can determine whether or not he has established it as mitigating or whether it's mitigating and how much weight to give it in view of all of the evidence presented by both the state and the defense.
" 'I'm going to go through the mitigation I've heard and kind of give you my thoughts about mitigation ....
" 'Now, DHR is blamed for all of this, yet the evidence shows that every time someone tried to reach out to Calvin McMillan, whether it be Carol Weaver, Emma Cosby, whoever, Calvin *1192 McMillan tried his best to hurt them. Calvin McMillan had the same choice, personal choice, as Ella and Adella, his siblings, to accept what the State and DHR could offer and take personal responsibility for his future. He chose not to take personal responsibility for his future, but he had a choice. He knows the difference between right and wrong. He can control his behavior and does not need medication to do so.'
"(R. 1738-1740.) The State then asserted 'DHR did not fail Calvin McMillan' but rather 'Calvin McMillan failed DHR.' As part of this, the State highlighted that McMillan's choices to misbehave caused each and every problem he encountered in the DHR system. As such, counsel for the state questioned 'whether DHR is even mitigating.'
"Because the prosecutor's arguments were not objectionable, McMillan's counsel were not deficient in their performance for failing to object and McMillan was not prejudiced by such failure.... [T]he Court properly instructed the jury that it could only consider a single aggravating circumstance in this case and the jury is presumed to have followed that instruction."
(C. 1481-82.) We agree with the circuit court, the prosecutor's argument was not improper; rather, it was an argument against application of the statutory mitigating circumstance that McMillan had no significant history of prior criminal activity. "[T]he circuit court correctly found that 'no purpose would be served by any further proceedings' in regard to this claim.' " Washington v. State, 95 So.3d 26, 60 (Ala. Crim. App. 2012).
D.
McMillan further argues that counsel was ineffective for failing to object when the prosecutor injected his personal opinion by referencing his service in Iraq during closing argument in the penalty phase. Specifically, McMillan challenges the following argument:
"When I hear age, he's 18, he's 19, I think back to my tour in Iraq and the 18- and 19-year-old privates and specialists and corporals who are undertaking responsibilities and performing tasks that are just awe-inspiring. Eighteen and nineteen year olds are capable of doing some amazing and truly wonderful things."
(Trial record, R. 1780-81.)
The circuit court made the following findings:
"As with McMillan's previous claims regarding alleged improper argument, the prosecutor's remarks were not objectionable when the arguments are reviewed in context as required by law. In context, the prosecutor's reference to service in Iraq was to remind the jury that 18 or 19 year olds can be called upon to serve in extremely adverse, life-threatening conditions and can do so remarkably well. This observation was a fair rebuttal to the proffered statutory mitigating circumstance of McMillan's age, showing that simply being 18 years old is not a handicap or condition that automatically results in lessened culpability. Further, the arguments concerning overcoming adversity 'were used to rebut McMillan's mitigating evidence concerning the hardships of his childhood.' The arguments highlighted by McMillan were proper rebuttal arguments and were not objectionable.
"Because the prosecutor's arguments were not objectionable, McMillan's counsel were not deficient in their performance for failing to object and McMillan was not prejudiced by such failure."
(C. 1482-83.) We agree with the circuit court. "Because the substantive claim underlying the claim of ineffective assistance *1193 of counsel has no merit, counsel could not be ineffective for failing to raise this issue." Lee v. State, 44 So.3d 1145, 1173 (Ala. Crim. App. 2009).
E.
McMillan argues that his counsel was ineffective for failing to object when the prosecutor argued that the district attorney's office, the victim's family, and the police all had agreed with the State's decision to seek the death penalty in his case.
McMillan challenges the following statements by the prosecutor in his opening statement:
"Now, ladies and gentlemen, several months ago my office decided that this case justified our seeking the death penalty. The family agreed with us, as did law enforcement, but none of that means anything. It doesn't matter what my office wants to do. It doesn't matter what I want to do. It doesn't matter what the family wants to do. The only thing that matters is what the 12 of you decide. The 12 of you will represent the conscience and convictions of Elmore County. Only you can decide what is true and just."
(Trial Record, R. 690-91.)
The circuit court made the following findings on this claim:
"In reviewing this precise argument, the Alabama Court of Criminal Appeals determined, 'this argument by the State in favor of the death penalty was properly waged, as a prosecutor is allowed to do in a capital case. Moreover, it ultimately served as a reminder to the jury members of their duty in making the decision as to the sentencing recommendation.' McMillan [v. State ], 139 So.3d [184] at 239 [ (Ala. Crim. App. 2010) ]. Noting that the prosecutor's comments, in context, did not in any way urge the jury to ignore its penalty-phase role, the Alabama Court of Criminal Appeals found that '[t]here was no error by the prosecutor in this argument.' McMillan, 139 So.3d at 240.
"The ruling of the Alabama Court of Criminal Appeals was not that any error was harmless, not 'plain' or not affecting substantial rights of the appellant, but that there was no error. That finding is the law of this case. As such, counsel could not have been deficient in their performance for failing to object to this argument and McMillan did not suffer Strickland prejudice."
(C. 1483-84.)
On direct appeal, this Court held that the above argument did not constitute error. "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." Lee, 44 So.3d at 1173.
VII.
McMillan next argues that the circuit court erred in dismissing his claim that his trial counsel was ineffective for failing to object to the trial court's reliance on other cases when deciding to disregard the jury's recommendation and sentence McMillan to death. Specifically, McMillan challenges the following statements in the circuit court's sentencing order in the section entitled "Justifications for Override":
"This Court is aware of many cases in Alabama over the years where the death penalty has been upheld as the appropriate punishment for the capital offense of an intentional murder during the course of committing a robbery 1st degree.... No juror is in a position to compare this case with other capital cases as they do not have the resources and benefit of the decisions from the appellate courts nor the personal experience received by trying and deciding these types of cases. When this Court compares the facts of *1194 this case to similar cases there is little question that, when compared to other cases with similar facts, a sentence of death is not in any way a disproportionate sentence."
(Trial Record, C. 572-73.) McMillan argues that the above comments reflect that the circuit court deprived McMillan of an individualized sentencing determination.
The circuit court made the following findings on this claim:
"In sentencing McMillan to death, the Court noted 'that a proper weighing of the aggravating circumstances and mitigating circumstances does not support a sentence of life without parole.' That finding came at the end of a detailed sentencing order that established conclusively that the Court provided McMillan the individualized sentencing determination required by the Constitution and under Alabama law. This Court emphasized that it was required to 'weigh the aggravating circumstances against the mitigating circumstances' including the jury's recommendation and, ultimately, found that the aggravating circumstance outweighed the mitigating circumstances requiring a sentence of death.
"McMillan cannot establish prejudice as to this claim. The Alabama Court of Criminal Appeals performed a proportionality review (required by law) during the direct appeal and concluded that '[t]he penalty in this case is neither disproportionate nor excessive when compared to the penalties imposed in similar cases, considering the circumstances surrounding both the crime and McMillan.' McMillan [v. State ], 139 So.3d [184] at 269 [ (Ala. Crim. App. 2010) ]. That court determined that 'death is the proper sentence in this case' and concluded that the sentence imposed by this Court was supported by '[a]n independent weighing of the aggravating and mitigating circumstances.' Id. Thus, assuming arguendo that the Court's order can be read as encompassing improper 'other case' considerations, such considerations were harmless, as determined by the Court of Criminal Appeals who performed an independent reweighing of the aggravating circumstances and mitigating circumstances. Thus, it can be fairly said that any error by counsel was harmless and did not constitute prejudice under Strickland [v. Washington, 466 U.S. 668 (1984) ].
"....
"Even today, McMillan would be unable to establish prejudice. The Court did not consider 'other cases' considerations such as to deprive McMillan an individualized sentencing determination. Quite simply, the aggravating circumstance outweighs the mitigation proffered at sentencing. These factors are unique to the facts of McMillan's crime and the facts and circumstances of his life relevant to sentencing. This Court thoroughly and completely considered all factors required in reaching the decision to impose the most severe punishment allowable under the law. As such, McMillan cannot establish prejudice under Strickland as to this claim."
(C. 1486-87.)
On direct appeal, this Court addressed, in depth, the circuit court's decision to override the jury's recommendation. McMillan, 139 So.3d at 207-21. On appeal, McMillan argued that when overriding the jury's recommendation the circuit court improperly considered evidence the jury was not privy to. In finding that the circuit court's decision was consistent with Alabama law, this Court specifically quoted the above comments in the sentencing order that McMillan now argues are improper. We stated: "The trial court's sentencing *1195 order and the record support its findings as to the jury override, as does the holding in Ex parte Carroll[, 852 So.2d 833 (Ala. 2002) ]." 139 So.3d at 221.
A review of the circuit court's sentencing order clearly shows that the circuit court properly applied existing law when it overrode the jury's recommendation. "Because the substantive claim underlying the claim of ineffective assistance of counsel has no merit, counsel could not be ineffective for failing to raise this issue." Lee, 44 So.3d at 1173. The circuit court correctly summarily dismissed this claim.
VIII.
McMillan next argues that the circuit court erred in summarily dismissing his claim that his trial counsel was ineffective for failing to adequately argue his motion seeking to suppress his statements to police. Specifically, he argues that trial counsel should have presented evidence of his intellectual defects in support of the motion to suppress.
The circuit court made the following findings on this claim:
"Here, the forensic examination revealed that McMillan suffered from no thought disorder and his thought processes were coherent and goal-directed. McMillan further understood the charges against him and was found able to assist his counsel against the charges and 'has the capacity to understand his legal situation.' McMillan also possessed both understanding and appreciation for his legal situation. Overall, McMillan was found 'capable of understanding his legal situation, assisting his attorneys, and proceeding to disposition and/or trial' and 'capable of retaining and comprehending basic concepts of the trial process.' The court-appointed examiner further noted, 'McMillan appears to be capable of understanding his legal situation and assisting his attorneys.' McMillan is not mentally retarded, and performs at a level above mental retardation.
"....
"Finally, McMillan's attorneys had the benefit of the assistance of a licensed mental health professional, Dr. Kimberly Ackerson. Dr. Ackerson's opinion was that McMillan's behavioral problems sprang from a lack of attachment when McMillan was an infant as well as the after-effects of an alleged sexual assault. Rather than suffering from mental retardation, Dr. Ackerson noted that McMillan had been diagnosed with conduct disorder. Dr. Ackerson further noted a diagnosis of oppositional defiance disorder. Dr. Ackerson further found the presence of symptoms of post traumatic stress disorder and antisocial personality disorder. Dr. Ackerson's testimony also revealed that she relied, in part, on the court-ordered evaluation performed by Dr. Kirkland.
"Accordingly, the evidence before the Court is sufficient to establish that defense counsel provided reasonably competent assistance of counsel (i.e., were not deficient) in that their strategy was consistent with the opinions of multiple experts, including several who appeared on behalf of McMillan. Not a single expert for the defense found evidence of mental retardation. Indeed, the experts presented by the defense all concluded that McMillan suffered from behavioral disorders consistent with the documentation from DHR and somewhat consistent with the findings of the court-appointed expert."
(C. 1489-93.)
The trial record shows that counsel moved to suppress McMillan's statement to police. (Trial Record, C. 219-20.) A hearing was held on the motion. McMillan argued that his statement was unconstitutionally *1196 procured because he was submitted to interrogation after invoking his right to counsel. On appeal, this Court held that McMillan had waived his right to counsel and that the statement was properly admitted into evidence. See McMillan, 139 So.3d at 196-98.
Based on the experts who evaluated McMillan, counsel had no reason to doubt McMillan's mental health or to argue that ground in the motion to suppress his statement. Therefore, McMillan could not show that counsel's conduct was deficient. The circuit court correctly summarily dismissed this claim pursuant to Rule 32.7(d), Ala. R. Crim. P.
IX.
McMillan next argues that his trial counsel was ineffective for conceding in closing argument that McMillan was the perpetrator of the murder. McMillan challenges the following statement made by his defense counsel in closing: "We have an eyewitness that got closer to Calvin McMillan than I am to you and that is Robbie Lusk." (Trial Record, R. 1414.)
The circuit court made the following findings on this claim:
"During closing argument, counsel observed, 'The first thing that is consistent is nobody in that parking lot can say that Calvin McMillan was there that night and committed this offense. Nobody, nobody could say it when they were sitting on that witness stand four feet away from Mr. McMillan. Nobody could look at him and say that's the guy that was there that night.' Later, defense counsel again emphasized that no eyewitnesses could point out McMillan. Even later, counsel stated, '... the State has to prove that it was Mr. McMillan that was out there that day, that evening, and committed the robbery.' This is another point where the State basically wants you to disregard the eyewitness testimony. Toward the end of his argument, counsel again argued, 'And they haven't shown that was Calvin McMillan there at the scene that night committing that offense.' Again, counsel argued there was nothing linking McMillan to being at Wal-Mart on the night of the offense. Continuing on his theme, defense counsel again asserted that there was not sufficient evidence to prove that McMillan was the person in the parking lot of Wal-Mart on the night of the murder. In conclusion, counsel described the only person that put McMillan in the parking lot, codefendant [Rondarrell] Williams, as a liar and reminded the jury that the other eyewitnesses could not pick McMillan out of a lineup or otherwise identify him, reminding them that [Robert] Lusk suggested the person might have long hair. Counsel then stated, 'Just because Mr. Martin was shot doesn't mean Mr. McMillan did it. The State has to prove that he did.'
"All in all, it is clear that defense counsel did not concede that McMillan shot Martin. In context, it appears that counsel misspoke during the heat of battle. In fact, counsel immediately corrected himself by changing his misstatement to 'or extremely close to the black male on that night.' The context of the overall argument regarding Lusk's testimony centered on the fact that Lusk described hair coming out from beneath the hat worn by the shooter, something defense counsel stated would be impossible for McMillan because of his short cropped hair. He concluded his argument about Lusk's testimony by reminding the jury that Lusk could not pick McMillan out of a lineup, concluding 'Calvin wasn't the guy.' In context, therefore, counsel's misstatement did not affect the thrust or overall defense theme as stated in the closing argument.
"The Court finds that the inadvertent misstatement by defense counsel, immediately *1197 corrected, does not constitute deficient performance and, in any event, McMillan was not prejudiced by the closing argument of counsel."
(C. 1496-97.)
As the circuit court correctly noted, it appears that the challenged remark by counsel was merely a misstatement and was not a concession of McMillan's guilt. Counsel repeatedly argued in closing that there was no one who could identify McMillan as the person in the parking lot at the time of the murder. Counsel cannot be deemed ineffective for making a misstatement similar to the one that occurred in this case. "Effective counsel does not mean errorless counsel." Birt v. Montgomery, 709 F.2d 690, 705 (11th Cir. 1983). There was no material issue of fact or law that would entitle McMillan to relief; therefore, the circuit court correctly summarily dismissed this claim. See Rule 32.7(d), Ala. R. Crim. P.
X.
McMillan last argues that he cannot be sentenced to death because, he says, he is intellectually deficient and imposing a death sentence on him violates the United States Supreme Court's holding in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
The circuit court made the following findings in regard to this claim:
"This claim is dismissed because it could have been, but was not, raised at trial, nor was it raised on appeal. Ala. R. Crim. P., Rule 32.2(a)(3)(5).
"Alternatively, the Court dismisses this claim because the record establishes that it is without merit. As part of the court ordered evaluation in this case, McMillan was evaluated for the purpose of mental retardation. McMillan's full-scale IQ was measured at 76, above the 75 'cut-off' that was not addressed in Hall v. Florida, [572 U.S. 701,] 134 S.Ct. 1986 (2014) (finding unconstitutional a bright-line cutoff of a 70-IQ score that does not take into account the standard error of measurement). Here, even taking into account the standard error of measurement McMillan's score would have remained above the generally accepted score of 70 (two standard deviations below 100) that constitutes the intelligence-quotient portion of a mental-retardation analysis. And that would assume the largest standard error of measurement operating such as to overestimate McMillan's intelligence. As a result, McMillan's full-scale IQ score placed him higher than 70-even taking into account the standard error of measurement; thus, he cannot satisfy the intelligence-quotient aspect of a mental-retardation diagnosis.
"Nor is this a case where McMillan's adaptive functioning was not considered. As part of the court-ordered assessment, McMillan was administered the Adaptive Behavior Assessment System 2 (ABAS2). Thus, the evaluation in this case did not depend solely on McMillan's IQ scores, but also on a test of adaptive behaviors. The expert concluded that McMillan 'is not mildly retarded, but functions in the classification range immediately above the classification of mild mental retardation as well as in the range of low average intellectual functioning.' As to adaptive functioning, this Court took notice in its sentencing order of Dr. Kirkland's finding that McMillan's 'intellectual functioning and social adaptive functioning were on a high borderline to low average intellectual level.' Again, this finding by a court-ordered expert provides a basis for determining that McMillan does not meet the adaptive functioning aspect of a mental retardation diagnosis.
"Further, Carol Weaver, McMillan's aunt who testified on McMillan's behalf *1198 at trial, was 'interviewed in depth concerning McMillan's developmental history and symptom picture' by the court appointed expert. Weaver indicated that she 'would have never characterized McMillan as being mentally retarded.' Ultimately, the examiner noted that McMillan's history revealed problems with his behavior, a lifetime of being subjected to neglect and abandonment, and a history of multiple foster-home placements. The picture of McMillan painted by the court-appointed expert is very similar to that painted by the defense expert who testified at trial. Again, this information supports a findings that McMillan is not mentally retarded."
(C. 1501-1502.)
First, McMillan was tried and convicted in 2009. The Atkins decision was released in 2002. Clearly, counsel could have raised this issue at trial or on direct appeal, but did not; therefore, this claim is procedurally barred in this postconviction proceeding.[2]
Alternatively, the circuit court found that the record clearly showed that McMillan is not mentally deficient as that term had been defined by the Alabama Supreme Court in Ex parte Perkins. Based on this Court's review of the trial record and this record, we agree with the circuit court's findings set out above. McMillan does not meet the definition of mentally deficient as set out by the Alabama Supreme Court in Ex parte Perkins.
For the foregoing reasons, we affirm the circuit court's summary dismissal of McMillan's petition for postconviction relief attacking his capital-murder conviction and sentence of death.
AFFIRMED.
Kellum, Burke, and Joiner, JJ., concur. Windom, P.J., recuses herself.

This Court has taken judicial notice of the record of McMillan's direct appeal. See Nettles v. State, 731 So.2d 626 (Ala. Crim. App. 1998).

In Part II of this opinion, this Court determined that McMillan's trial counsel was not ineffective for failing to raise an Atkins claim at trial. Therefore, there is nothing that would preclude this Court from applying this procedural bar in this case. "[The appellant] has not established that counsel's conduct was ineffective, and his substantive claim remains procedurally barred." Mitchell v. State, 934 P.2d 346, 350 (Okla. Crim. App. 1997).